UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PETER KILCHENSTEIN,                      *

    Plaintiff,                           *

v.                                       *          Civil Action No. EA-24-3070

UNITED STATES OF AMERICA,                *

    Defendant.                           *

## MEMORANDUM OF DECISION

On October 22, 2024, Plaintiff Peter Kilchenstein initiated the above-captioned action in which he asserts a single negligence claim against Defendant United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*  ECF No. 1.  On March 30, 2026, the undersigned granted the United States' motions to exclude expert testimony and for partial summary judgment.  ECF Nos. 38–39, 45–46; *Kilchenstein* v. *United States*, Civil Action No. EA-24-3070, 2026 WL 872371 (D. Md. Mar. 30, 2026).  Following the United States' concession of liability, the Court held a bench trial on the issue of damages on May 19, 2026.  ECF Nos. 55; 58.  Pursuant to Federal Rule of Civil Procedure 52, this Memorandum of Decision sets forth the Court's findings of facts and conclusions of law.  For the reasons set forth below, the Court enters judgment in favor of Mr. Kilchenstein and against the United States in the amount of $41,159.91.

## I.    INTRODUCTION

Rule 52 requires that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a).  "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  *Id.*  "In doing so, the Court must appraise the testimony and demeanor of the witnesses, assess and evaluate the

credibility of the witnesses, weigh the evidence, and choose among conflicting inferences and conclusions." *Brooks* v. *United States*, Civil Action No. TJS-21-1029, 2023 WL 6599008, at *1 (D. Md. Oct. 10, 2023).  Rule 52(a) does not, however, "require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient."  *Darter* v. *Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962) (internal quotation marks omitted).  Thus, the Court sitting as factfinder "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,' as there is no need for 'over-elaboration of detail or particularization of facts.'" *Wooten* v. *Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008), *aff'd*, 350 Fed. Appx. 812 (4th Cir. 2009) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment).

## II.    FINDINGS OF FACT

The Court makes the following findings of fact based on the stipulated facts, relevant documentary and testimonial evidence introduced at trial, as well as any reasonable inferences and credibility assessments drawn therefrom.

Mr. Kilchenstein "was involved in a motor vehicle accident involving a tractor trailer operated by an employee of the United States Postal Service on April 27, 2023."  ECF No. 57 ¶ 1.  "The United States has conceded that its employee was responsible for the accident and the United States is therefore liable in this case."  *Id.*; *see also* ECF No. 55.  On September 12, 2023, Mr. Kilchenstein filed an administrative claim for damages in which he indicated that he had injured his head, right shoulder, right elbow, back, and neck, and that various items of his personal property were damaged as a result of the April 27, 2023 accident.[1]  Joint Exhibit (JX)-1

---

[1] Plaintiff Peter Kilchenstein identified his damaged property as including a fishing pole, shot gun, and eyeglasses.  Joint Exhibit (JX)-1 at USA_0054; *see also* JX-5 at 145–152.

at USA_0054.[2]  Mr. Kilchenstein claimed $500,000 in personal injury and $10,000 in property

damage.  *Id.*  On October 22, 2024, Mr. Kilchenstein filed the instant action, asserting a single

count of negligence against the United States via the FTCA.  ECF No. 1.

Mr. Kilchenstein is a 58-year-old resident of Westminster, Maryland.  He is married to

Florence Kilchenstein and has six children.  Mr. Kilchenstein previously worked for the Internal

Revenue Service (IRS) as an information technology specialist.  JX-1 at USA_0199.  Mr.

Kilchenstein was employed by the IRS for many years and worked his way up to becoming a

software testing team leader.  For nearly his entire life, Mr. Kilchenstein has been an avid

outdoorsman.  He enjoys turkey and deer hunting, fishing, crabbing, and hiking.  His life-long

friend, Robert Ballentine, enjoys participating in these same outdoor activities.

On the date of the accident, April 27, 2023, Mr. Kilchenstein and Mr. Ballentine

embarked on what they had planned to be an overnight trip to southern Maryland for turkey

hunting and fishing.  At approximately 4:00 am, they were driving south on Interstate 95,

approximately one mile from Interstate 495 Capital Beltway interchange.  Mr. Ballentine was

operating a full-size pick-up truck and Mr. Kilchenstein was in the passenger seat.  Immediately

before the accident, Mr. Kilchenstein saw a tractor trailer quickly change lanes and approach

their vehicle from the right.  Mr. Kilchenstein heard a loud bang and felt the tractor trailer hit

them with force, which caused their vehicle to skid sideways and flip onto the driver's side.  An

airbag deployed, Mr. Kilchenstein heard metal skidding on the blacktop, and he felt the pick-up

truck slide at a high rate of speed.  Mr. Kilchenstein was terrified.  He next heard a very loud

crash, felt that they had impacted something (which he later learned was the highway guardrail),

---

[2] Page numbers refer to the pagination of the Court's Case Management/Electronic Case Files (CM/ECF) system printed at the top of the cited document, except that references to exhibits include both the exhibit number and, as applicable, the bates or page number of the referenced page(s).

3

and the pick-up truck then rolled multiple times.  Ultimately, after the pick-up truck traveled approximately one hundred yards, it came to a stop in an upright, wheels-down position.  Mr. Ballentine was shaken up but also conscious.  Both Mr. Kilchenstein and Mr. Ballentine tried to open the truck's driver- and passenger-side doors to no avail.  Mr. Kilchenstein saw smoke and feared that the truck was on fire and that other vehicles on the highway might hit them.  Someone approached the truck, asked if they were alright, and said that emergency medical services (EMS) had been notified and that the pick-up truck was not on fire.  Approximately 7 to 10 minutes later, EMS arrived.  EMS personnel began cutting open the door of the pick-up truck and, after about 10 to 15 minutes, they assisted Mr. Kilchenstein out of the vehicle.  Photographs of Mr. Ballentine's truck reflect that it was badly mangled.  JX-6.

EMS providers examined Mr. Kilchenstein on-scene and removed a few shards of glass from a cut above his right ear.  Mr. Kilchenstein also had a small cut on his right hand.  Mr. Kilchenstein declined to be transported to a hospital by EMS.  JX-5 at 4.  Instead, he called his wife and asked her to pick him up.  When Mrs. Kilchenstein arrived, she saw Mr. Kilchenstein on the side of the road talking with EMS personnel.  In addition to the injuries Mr. Kilchenstein identified in his testimony, Mrs. Kilchenstein observed scratches on his shins.  Mr. Kilchenstein and Mr. Ballentine left the scene of the accident with Mrs. Kilchenstein.  Mr. Kilchenstein testified that he began to feel as if he had fallen down a flight of stairs a couple of times.  His back and shoulder hurt, and he was sore everywhere.

Mr. Kilchenstein "presented to the Carroll Hospital Emergency Department in the afternoon of April 27, 2023[,] . . . because of injuries caused by the accident."  ECF No. 57 ¶ 2.  Records from Carroll Hospital reflect that Mr. Kilchenstein's chief complaint was that he "was a belted passenger in a truck roll over" and "had to be extracted from [the] vehicle."  JX-5 at 2.  Mr. Kilchenstein reported that he "has chronic lower back pain," and complained of "increased

lower back" pain, as well as pain to his right shoulder and neck.  *Id.*  The Emergency Department physician, Clara Kim, MD, noted that a whole-body CT scan of Mr. Kilchenstein "revealed no fractures or internal injuries."[3]  *Id.* at 5.  She concluded that Mr. Kilchenstein's "pain is likely musculoskeletal pain as a result of the accident."  *Id.*  Dr. Kim noted that she had "low concern for significant trauma at this time."  *Id.*  Mr. Kilchenstein was given a pain reliever and muscle relaxer while at the Emergency Department, and a "short supply" of muscle relaxers was sent to his home pharmacy.  *Id.* at 5–6.  Mr. Kilchenstein was discharged with instructions to follow up with his primary care physician.  *Id.* at 6.

Mr. Kilchenstein testified that within days of the accident he went to urgent care because he felt "foggy," meaning he lost his attention span and thought process briefly, and also because he had blurry vision and light sensitivity in his eyes.  Medical records from ExpressCare of Westminster reflect that Kevin Meadowcroft, PA-C, examined Mr. Kilchenstein on April 29, 2023.[4]  *Id.* at 44.  Mr. Kilchenstein's chief complaint was a headache, which he had experienced since April 27, 2023, following the motor vehicle accident.  *Id.*  Mr. Kilchenstein denied experiencing "weakness, lightheadedness," "eye pain, blurry vision, eye redness," or "aches/pains."  *Id.*  The record of this encounter documents an abrasion on Mr. Kilchenstein's right hairline, 2.2 centimeters in length, that was healing.  *Id*. at 45.  PA-C Meadowcroft's examination revealed that Mr. Kilchenstein's "neck [was] supple with [a] good range of motion" and that he had "normal active cervical range."  *Id.*  The muscular examination also noted that

---

[3]  A "CT scan" is a cross-sectional, three-dimensional image of an internal body part produced by computed tomography chiefly for diagnostic purposes."  "CT scan." (Medical Definition) Merriam-Webster.com Dictionary, Merriam-Webster, https://perma.cc/4G3L-A6RL (last visited May 27, 2026).

[4]  "PA-C" is a physician assistant, certified.  "Pac." (Medical Definition) Merriam-Webster.com Dictionary, Merriam-Webster, https://perma.cc/392P-RD2R (last visited May 27, 2026).

Mr. Kilchenstein had increased tension in his trapezius muscles, a "diffuse spasm," and that he had not taken the prescribed muscle relaxer that afternoon. *Id.*; JX-1 at USA_0195. PA-C Meadowcroft diagnosed Mr. Kilchenstein as having post-concussion syndrome and a tension headache. JX-5 at 46. Mr. Kilchenstein was advised to see his primary care physician or return to the urgent care center if he did not feel better in seven days. *Id.*

At trial, Mr. Kilchenstein testified that he continues to experience "brain fog" intermittently and light sensitivity constantly. These complaints, however, are not documented in the medical record evidence, not even in ExpressCare of Westminster records, despite the fact that Mr. Kilchenstein testified that those were the complaints that prompted him to seek care that day. JX-5 at 44–46. Other medical records from Mr. Kilchenstein's primary care physician reflect no neurological or eye complaints. JX-1 at USA_0195 (Mr. Kilchenstein reported "[n]o visual changes or eye pain" and "[n]o headaches . . .[or] confusion."); JX-5 at 135 (same). When confronted at trial with the medical records reflecting the absence of these complaints, Mr. Kilchenstein acknowledged that he did not discuss light sensitivity with his primary care physician. Mr. Kilchenstein said that he has mentioned light sensitivity to an eye care specialist but acknowledged that there are no medical records in evidence to substantiate those complaints.

Mr. Kilchenstein also "sought treatment from his primary care provider, Dr. Abraham Mathew, for injuries caused by the accident." ECF No. 57 ¶ 3. Mr. Kilchenstein first consulted Dr. Mathew about the accident on May 2, 2023. JX-1 at USA_0195. Mr. Kilchenstein reported intermittent pain in his lower back and neck, which he rated as a three on a ten-point scale. *Id.* Mr. Kilchenstein reported that he was taking pain relievers and muscle relaxers. *Id.* Dr. Mathew's spine and musculoskeletal examination revealed that Mr. Kilchenstein had a normal range of motion. *Id.* at USA_0197. Dr. Mathew's progress notes reflect that he recommended physical therapy and advised Mr. Kilchenstein "that there was no hint of a dangerous problem

6

and that rapid recovery was expected." *Id.* at USA_0198. Dr. Mathew recommended that Mr. Kilchenstein follow up in a month. *Id.*

Mr. Kilchenstein engaged in "physical therapy from Erin Moberly, PT . . . of Pivot Physical Therapy for injuries caused by the accident." ECF No. 57 ¶ 4. Mr. Kilchenstein consulted with PT Moberly 16 times between May 11, 2023, and July 28, 2023. JX-5 at 48–50. Medical records from these physical therapy consultations reflect that Mr. Kilchenstein consistently reported an improvement in his symptoms. For example, on May 26, 2023, after six physical therapy sessions, Mr. Kilchenstein "state[d] he [wa]s noticing improvement in his symptoms." *Id.* at 101. On June 2, 2023, after two additional physical therapy sessions, Mr. Kilchenstein reported that "things [we]re still gradually improving." *Id.* at 93. This is consistent with what is documented in Dr. Mathew's medical records. Dr. Mathew saw Mr. Kilchenstein again on June 2, 2023, and recorded in the progress notes that Mr. Kilchenstein was undergoing physical therapy, had experienced "about 60% improvement," and wanted to continue physical therapy. *Id.* at 135 (all caps removed). At his June 5, 2023 physical therapy consultation, Mr. Kilchenstein "report[ed] that he 'feels better every day', definitely notices improvement in all symptoms since starting [physical therapy]." *Id.* at 82. Notes from this consultation also reflect that Mr. Kilchenstein reported that his neck felt tight or sore only when laying down to sleep or turning his head while driving. *Id.* Mr. Kilchenstein reported a "constant ache/discomfort" in his right shoulder and lower back, although he acknowledged that he had discomfort in those areas before the accident. *Id.* On June 26, 2023, after 13 sessions, Mr. Kilchenstein "report[ed] that his lower back seem[ed] to be better," that "pain [was] still present but closer to the level that [it] was before the accident." *Id.* at 66. Mr. Kilchenstein "[s]tate[d] he [wa]s most bothered by the pain in his neck," which was "notable [when] turning [his] head while driving and . . . sleeping." *Id.* Mr. Kilchenstein also reported that he did "stretches when he remember[ed]

which seem[ed] to help." *Id.* Just over a month later, on July 28, 2023, the medical records from

Mr. Kilchenstein's final physical therapy consultation reflect that:

> [Patient] reports that he has "definitely made improvements" [with physical therapy] and feels like things continue to gradually improve.
>
> States that he feels like the low back and [right] shoulder are back to baseline before the car accident.
>
> Still has "very mild", intermittent soreness in the neck but only [with] head turns while driving and when first laying down to sleep.

*Id.* at 56 (line breaks added). That same day, Mr. Kilchenstein asked to be discharged from

physical therapy. *Id.* On August 11, 2023, Mr. Kilchenstein saw Dr. Mathew a third and final

time with respect to the motor vehicle accident. *Id.* at 139. Dr. Mathew recorded in his progress

notes that Mr. Kilchenstein had been discharged from physical therapy and was "doing 99%

better." *Id.* (all caps removed).

Mr. Kilchenstein did not seek medical treatment in connection with the April 27, 2023

accident after this last appointment with Dr. Mathew other than pain management every month.

Mr. Kilchenstein began monthly pain management treatment 10 or 15 years before the accident

due to pre-existing lower back and shoulder pain. Mr. Kilchenstein did not seek any mental

health treatment after the accident. He testified that he continues to do physical therapy

exercises to this day to the best of his ability and that he tries to do them every day. Mrs.

Kilchenstein, however, testified that Mr. Kilchenstein continued the physical therapy exercises

for a while, but that he does not do them now. She could not pinpoint when Mr. Kilchenstein

stopped doing the exercises other than to say that he has not done them in the last six months and

that he might have done them sometime in the last year. Mrs. Kilchenstein also testified that she

observed that Mr. Kilchenstein made some progress with physical therapy, but his symptoms

worsened after he stopped going to physical therapy.

At trial, Mr. Kilchenstein testified that he experienced chronic back and shoulder pain for years, but that it was under control before the accident and did not interfere with his daily activities and pastimes.  Mr. Kilchenstein said that since the accident, his back pain has worsened, and he is in constant pain.  He also testified that the pain he experiences today is the same as it was right after the accident.  For example, at trial Mr. Kilchenstein said that he continues to feel as if he had fallen down a flight of stairs, just as he did the day of the accident.  Mr. Kilchenstein further testified that he did not notice a substantial improvement from physical therapy and that it was not helpful.

This testimony is difficult to square with the medical record evidence.  When confronted with his medical records, Mr. Kilchenstein was evasive at times.  For example, when presented with Dr. Mathew's May 2, 2023 progress notes (JX-1 at USA_0195–0198), Mr. Kilchenstein initially said that he was not familiar with the document.  He then acknowledged that he had seen it before at his deposition, but he did not know who had prepared it.  After confirming that the medical record was signed by Dr. Mathew, Mr. Kilchenstein claimed he did not know what the document was.  Only upon further inquiry from the Court did Mr. Kilchenstein acknowledge that he knew that it was Dr. Mathew's May 2, 2023 progress notes.

Mr. Kilchenstein's testimony with respect to his medical records was also inconsistent.  In some instances, Mr. Kilchenstein contested information that was documented in a medical record.  For example, he testified that he was not advised that there was "no hint of a dangerous problem and that rapid recovery was expected," as is reflected in Dr. Mathew's May 2, 2023 progress notes.  Mr. Kilchenstein also disputed that he had told Dr. Mathew was "doing 99% better."  On the other hand, when asked about medical records from his June 5, 2023 physical therapy consultation, Mr. Kilchenstein testified that he did not recall saying that he "fel[t] better every day," but he could have.  He also remembered telling the physical therapist something

similar to what was documented in the July 28, 2023 physical therapy notes.  Yet, he also maintained throughout his testimony that he did not notice any improvement from physical therapy.  When asked about this inconsistency, Mr. Kilchenstein stated that he stopped physical therapy because he was not feeling much improvement.  Yet, he also acknowledged that he had told the provider that he had made improvement and again confirmed that the statements in the medical records were a fair summary of what he told the provider.  The internal inconsistencies in his testimony, together with the contradictions between many of his assertions at trial and contemporaneous medical records, make it difficult to credit Mr. Kilchenstein's testimony regarding his current physical symptoms and their effect upon his ability to engage in pastimes.

Mr. Kilchenstein testified at trial that his back and shoulder pain significantly limit his ability to go fishing, crabbing, and hunting.  For example, he can no longer hunt with a traditional bow and instead must use a crossbow.  Mr. Ballentine testified that he and Mr. Kilchenstein went fishing, hunting, hiking, and camping together throughout the course of their lives.  Mr. Ballentine believes that these activities created a deeper bond because they are more in-depth, year-round activities, and are part of a "lifestyle."  Mr. Ballentine initially testified that Mr. Kilchenstein does not go on hunting trips anymore.  Yet, Mr. Ballentine acknowledged that he and Mr. Kilchenstein went hunting together as recently as April 2026, although it was a less physically strenuous trip compared to previous outings.  Mr. Ballentine testified that this excursion was not as much about hunting as it was about spending time together.

Mr. Kilchenstein initially testified that he missed four days of work due to the accident, which equates to 40 hours of work because he was working 10-hour days at the time.  Mr. Kilchenstein later testified that he missed a total of 80 hours of work, and that the additional 40 hours was due to medical appointments and physical therapy.  Mr. Kilchenstein also testified that after the accident, his physical discomfort affected his ability to drive long distances, including

commuting to work.  Mr. Kilchenstein said that he had been working from home for approximately 15 to 18 years and that at an unspecified point in time, he was required to spend multiple hours a day commuting to work five days per week.  Mr. Kilchenstein testified that his commute took him past the accident location, but he did not state what, if any, effect that had upon him.  Mr. Kilchenstein did not offer testimony as to when he retired from the IRS, why he did so, or what, if any, effect his retirement had on him mentally or emotionally.  Mrs. Kilchenstein testified that Mr. Kilchenstein was very proud of his job and that he left his job because he had to drive by the accident scene four, and then five, days per week.

Mr. Kilchenstein testified that his youngest daughter is a cheerleader and that he cannot travel the long distances required to attend her competitions because he does not feel comfortable riding in a vehicle for that length of time due to the accident.  Mr. Kilchenstein Jr. testified that Mr. Kilchenstein no longer takes the family on long road trips, hesitates when driving around larger vehicles on the road, and has not attended his sister's cheerleading events, many of which are in other states.  Mr. Kilchenstein Jr., however, was not aware of any reason why his father could not fly to more distant cheerleading events, some of which were in Texas, Florida, and South Carolina.  Mrs. Kilchenstein testified that Mr. Kilchenstein is slower physically and does not do the things that he used to, such as fixing her car, yard work, cutting the grass, hunting, fishing, crabbing, or attending their youngest daughter's cheerleading competitions.  She said that Mr. Kilchenstein sleeps more and mostly engages in coin collecting.  Mr. Kilchenstein Jr. also testified that his father sorts through currency as a hobby, examining coins and bills through a microscope for misprints and other errors.

Mrs. Kilchenstein testified that Mr. Kilchenstein has nightmares.  She knows this because he frequently wakes up in the middle of the night and appears stressed and anxious.  Mr. Kilchenstein did not offer testimony on this topic.

### III.    CONCLUSIONS OF LAW

Mr. Kilchenstein's sole cause of action arises under the FTCA, which provides, in pertinent part, that the "United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances," except that it "shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  The FTCA "effects a limited waiver of the United States' sovereign immunity for 'personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of [their] office or employment.'"  *Welch* v. *United States*, 409 F.3d 646, 651 (4th Cir. 2005) (quoting 28 U.S.C. § 1346(b)(1)).  "Under settled principles of sovereign immunity, the United States, as sovereign, is immune from suit, save as it consents to be sued."  *United States* v. *Dalm*, 494 U.S. 596, 608 (1990) (internal quotation marks and citation omitted); *Webb* v. *United States*, 66 F.3d 691, 693 (4th Cir. 1995).  Thus, the United States cannot "be sued in tort except as permitted by the FTCA."  *Hart* v. *Casey*, Civil Action No. GJH-22-1216, 2022 WL 17989577, at *2 (D. Md. Dec. 28, 2022).

As the United States has conceded liability, the only remaining issue is the amount of compensatory damages, if any, the Court should award.  ECF Nos. 55; 57 ¶ 1.  Damages in a suit brought under the FTCA "are generally limited to the amount of the administrative claim."  *Spivey* v. *United States*, 912 F.2d 80, 83 (4th Cir. 1990); *see also* 28 U.S.C. § 2675(b) (limiting damages to the amount of the administrative claim except where there is newly discovered evidence or intervening facts).  As noted, Mr. Kilchenstein sought $500,000 in personal injury damages and $10,000 in property damages in his administrative claim.[5]  JX-1 at USA_0054. When evaluating damages, "the law of the state where the alleged misconduct occurred governs

---

[5]  The undersigned previously denied Plaintiff Peter Kilchenstein's motion to amend his Complaint to increase his request for damages to $1,000,000.  ECF No. 29; *Kilchenstein* v. *United States*, Civil Action No. EA-24-3070, 2025 WL 3713725 (D. Md. Dec. 23, 2025).

. . . the nature and measure of damages to be awarded." *Lawson* v. *United States*, 454 F. Supp. 2d 373, 417 (D. Md. 2006); *see also* 28 U.S.C. §§ 1346, 2674.  The Court therefore applies Maryland law.  "Compensatory damages can be divided into 'economic' and 'noneconomic damages.'" *Eastern Shore Title Co.* v. *Ochse*, 453 Md. 303, 334 (2017).  Under Maryland law, economic damages "will not be awarded without proof of pecuniary loss." *Id.* (internal quotation marks and citation omitted).  Further, a plaintiff has the "burden to prove [such] damages with a reasonable amount of certainty." *Lewin Realty III, Inc.* v. *Brooks*, 138 Md. App. 244, 295 (2001), *aff'd*, 378 Md. 70 (2003), and *abrogated on other grounds* by *Ruffin Hotel Corp. of Maryland* v. *Gasper*, 418 Md. 594 (2011).  On the other hand, noneconomic damages, "may be awarded without proof of pecuniary loss." *Eastern Shore Title Co.*, 453 Md. at 334 (internal quotation marks and citation omitted).  Nevertheless, in both instances, "an award for compensatory damages must be anchored to a rational basis on which to ensure that the awards are not merely speculative." *AXE Props. & Mgmt., LLC* v. *Merriman*, 261 Md. App. 1, 46 (2024).

Here, as a result of the negligent conduct, Mr. Kilchenstein asserts that he "suffer[ed] great pain and injury, mental anguish, and has incurred medical expenses." ECF No. 1 ¶ 9.  Mr. Kilchenstein seeks an award of compensatory damages that includes: (1) economic damages, consisting of past medical expenses, lost wages, and property damage; and (2) noneconomic damages.[6]  As to economic damages, the parties have stipulated that as a result of the accident Mr. Kilchenstein incurred $8,696.67 in fair and reasonable medical expenses, $2,790.80 in lost

---

[6]  The undersigned previously granted partial summary judgment in favor of the United States and against Mr. Kilchenstein on the issue of lost future earnings, thus rendering this category of damages unavailable.  ECF Nos. 45–46; *Kilchenstein* v. *United States*, Civil Action No. EA-24-3070, 2026 WL 872371, at *6-9 (D. Md. Mar. 30, 2026).  Mr. Kilchenstein does not seek an award of future medical expenses.

wages, and $2,172.44 in property damage.  ECF Nos. 57 ¶ 6; 62 ¶ 2.  Mr. Kilchenstein will

therefore be awarded $13,659.91, the total amount of the stipulated economic damages.  ECF

No. 62 ¶ 2.  As to the remaining damages, the parties dispute an additional $2,790.80 in lost

wages and the amount of noneconomic damages.

The stipulated lost-wage damages ($2,790.80) are based on 40 hours of work that Mr.

Kilchenstein missed in May 2023 due to the accident.  These hours are supported by a letter

signed by Dr. Mathew, Mr. Kilchenstein's primary care physician, which documents four days of

missed work.[7]  JX-5 at 143.  The contested lost-wage damages are premised upon an additional

40 hours of work that Mr. Kilchenstein missed work due to medical appointments and physical

therapy associated with the accident.  *See* II., *supra*; JX-5 at *.[8]  There is, however, an

inadequate evidentiary basis to support award of damages for these additional lost wages.  "It is

the plaintiff's burden to prove damages through the use of evidence such as 'receipts, copies of

checks, or any other means of computation that would allow a factfinder to value his claimed

loss.'"  *Neal* v. *United States*, 599 F. Supp. 3d 270, 301 (D. Md. 2022) (quoting *Nguti* v. *Safeco

Ins. Co.*, Civil Action No. PX-15-742, 2017 WL 2778821, at *4 (D. Md. Jun. 27, 2017)).

As noted, *see* II., *supra*, Mr. Kilchenstein initially testified that he missed four days of

work due to the accident.  When presented with the exhibit that summarizes the total amount of

his claimed damages (JX-5 at *), Mr. Kilchenstein testified that his lost wages were actually

based on 80 hours of missed work.  Mr. Kilchenstein did not, however, offer any documentary

support for the additional 40 hours, such as timekeeping records or calendar entries, nor did he

testify as to how he had calculated the additional 40 hours.  Given the inconsistencies in Mr.

---

[7] In May 2023, Mr. Kilchenstein worked four 10-hour days per week.  *See* II., *supra*.

[8] The 80 hours claimed in lost wages are reflected on physical page two of JX-5, which
does not bear a page number, but will be referred to herein as page "*".

Kilchenstein's testimony and the contradictions between it and the documentary evidence, the undersigned does not credit Mr. Kilchenstein's unsupported assertion that he lost an additional 40 hours of work due to medical appointments.  Even if the undersigned were to utilize the medical records that reflect the dates of various physical therapy and other medical appointments, there is an inadequate basis upon which to determine how many hours of work these medical appointments displaced.  In sum, Mr. Kilchenstein has not carried his burden of demonstrating the additional lost-wage damages to a reasonable degree of certainty.  *Sugarman* v. *Liles*, 460 Md. 396, 439 (2018) ("Damages must be actual, not speculative, remote, or uncertain."); *see also Neal*, 599 F. Supp. 3d at 303-304 (collecting cases).  Accordingly, the undersigned declines to award an additional $2,790.80 in lost wages.

Under Maryland law, "pain, suffering, pre-impact fright, inconvenience, physical impairment, disfigurement, loss of consortium, or other non-pecuniary injury" are cognizable as noneconomic damages.  MPJI-Cv 10:2, Compensatory Damages for Bodily Injury (2025). As relevant here, decisions of this Court have also recognized that in Maryland, noneconomic damages may be awarded for physical pain and suffering, mental and emotional suffering, anxiety, and the loss of the capacity to enjoy the usual and familiar tasks of life.  *Harris-Reese* v. *United States*, 615 F. Supp. 3d 336, 378-379 (D. Md. 2022); *Lawson*, 454 F. Supp. 2d at 424; *Muenstermann by Muenstermann* v. *United States*, 787 F. Supp. 499, 527 (D. Md. 1992).  The "loss of enjoyment of life includes the impairment of the capacity . . . to enjoy a particular avocation" or hobby.  *Smallwood* v. *Bradford*, 352 Md. 8, 20 (1998) (internal quotation marks and citation omitted).

As to emotional distress, Maryland permits recovery "'if there was at least a consequential physical injury,' in the sense that 'the injury for which recovery is sought is capable of objective determination.'"  *Fields* v. *Walpole*, Civil Action No. DKC-11-1000, 2013

WL 2154798, at *3 (D. Md. May 16, 2013) (quoting *Hoffman* v. *Stamper*, 385 Md. 1, 34 (2005)). "This physical manifestation requirement allows recovery for 'such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs.'" *Id.* (quoting *Hoffman*, 385 Md. at 34-35). Maryland does not, however, permit recovery for emotional distress "based on the plaintiff simply saying, '[t]his made me feel bad; this upset me,'" due to the "concern that mental distress may be too easily simulated and that there was no practical standard for measuring such distress." *Hoffman*, 385 Md. at 34. This caution also applies more broadly to noneconomic damages as a whole. *Derosier* v. *USPLabs, LLC*, Civil Action No. CCB-10-2559, 2011 WL 5825990, at *5 (D. Md. Nov. 17, 2011) ("Maryland courts have expressed some skepticism about non-economic damages and have consistently demanded 'a sufficient guarantee of genuineness' as a prerequisite to granting them.") (quoting *Vance* v. *Vance,* 286 Md. 490, 498 (1979)).

Here, Mr. Kilchenstein seeks noneconomic damages based on the traumatic experience of the accident, as well as his asserted inability to engage in leisure and family activities, need to retire from his employment, and experience of nightmares. As this Court has observed previously, the "full extent of nonpecuniary damages is difficult to measure." *Muenstermann*, 787 F. Supp. at 527; *see also Neal*, 599 F. Supp. 3d at 305. Although the "amorphous nature of the subject and the infinite variables that come into play make it impossible for courts to fashion any precise rule," "the strictures of reasonableness, and the nature of the injuries, length of the suffering are guides which assist in determining a fair award." *Muenstermann*, 787 F. Supp. at 527. The undersigned is guided by these principles, as well as by decisions of this Court

16

applying Maryland law in an FTCA or negligence claim to determine the appropriate amount of noneconomic damages.

The undersigned finds that an award of noneconomic damages based on the nature and circumstances of the accident is warranted. By all accounts, the April 27, 2023 motor vehicle accident was horrific. To say that the pick-up truck in which Mr. Kilchenstein was a passenger was a total loss does not capture the damage to the vehicle depicted in the photographic exhibits. JX-6. Mr. Kilchenstein credibly testified that he was terrified during the accident and thought he was going to die. Indeed, the fact that Mr. Kilchenstein walked away from the pick-up truck with no loss of consciousness, broken bones, or other serious physical injury is truly miraculous.

Notwithstanding the severity of the collision, the medical record evidence indicates that Mr. Kilchenstein's injuries were minor. He experienced "musculoskeletal pain," but had "no fractures or internal injuries." JX-5 at 5. The cut on Mr. Kilchenstein's head was 2.2 centimeters in length (less than one inch) and was described as "healing" two days after the accident. *Id.* at 45. The emergency care physician had "low concern for significant trauma," *id*. at 5, and Mr. Kilchenstein's primary care physician concluded that "that there was no hint of a dangerous problem and that rapid recovery was expected," JX-1 at USA_0198. Physical examinations in the wake of the accident revealed that while Mr. Kilchenstein reported an increased level of lower back and shoulder pain, he rated that pain as 3 out of 10, and had a normal range of motion in his back and neck. JX-1 at USA_ 0197–USA_0198; JX-5 at 45. Other medical records reflect that Mr. Kilchenstein reported steady improvement in his symptoms following physical therapy. *See* II., *supra*. Ultimately, little over three months after the accident, Mr. Kilchenstein asked to be discharged from physical therapy because his lower back and shoulder pain were "back to baseline before the car accident" and he had "intermittent soreness in his neck," which he described as "very mild." JX-5 at 52. Mr. Kilchenstein's

17

primary care physician documented in his August 11, 2023 progress notes that Mr. Kilchenstein was "doing 99% better." *Id*. at 139 (all caps removed). Importantly, Mr. Kilchenstein did not seek further medical care in connection with the accident, other than monthly pain management treatment, which he had received for more than a decade before the accident.

Thus, the contemporaneous medical records reflect that Mr. Kilchenstein's injuries from the accident were slight and resolved following approximately three months of medical treatment. Mr. Kilchenstein's trial testimony regarding the severity and duration of his post-accident symptoms is not credible, nor is it supported by any evidence other than his own testimony and that of his close relatives and friend, all of whom are interested witnesses. As discussed previously, *see* II., *supra*, many of Mr. Kilchenstein's assertions at trial regarding the continuing effects of the accident were either unsupported or directly contradicted by medical records. Moreover, due to the passage of time and the existence of longstanding chronic lower back and shoulder pain, it is entirely unclear that Mr. Kilchenstein's present physical challenges were caused by the April 27, 2023 accident.

As the undersigned noted in a prior decision in this case, "[u]nder Maryland law, expert testimony may be required to establish causation of injuries." *Kilchenstein*, 2026 WL 872371, at *7. Interpreting Maryland law, the United States Court of Appeals for the Fourth Circuit has explained:

> Expert testimony is not required . . . if the case falls into one of three categories: (1) if "a disability develops coincidentally with," or within a "reasonable time after," the subject act; or (2) if the proof of causation is "clearly apparent" from the nature and circumstances of the injury; or (3) if "the cause of the injury relates to matters of common experience, knowledge, or observation of laymen."

*Galloway* v. *Horne Concrete Const.*, 524 Fed. Appx. 865, 871 (4th Cir. 2013) (quoting *Wilhelm* v. *State Traffic Safety Comm'n*, 230 Md. 91, 99 (1962)). On the other hand, expert testimony is required "where the cause of an inj[u]ry claimed to have resulted from a negligent act is a

complicated medical question involving fact finding which properly falls within the province of medical experts (*especially when the symptoms of the injury are purely subjective in nature, or where disability does not develop until some time after the negligent act*)." *Wilhelm*, 230 Md. at 100 (emphasis added) (collecting cases). Applying the *Wilhelm* criteria, the Fourth Circuit held in *Galloway* that "no experts [we]re needed to establish that being rear-ended by an eighteen-wheel tractor-trailer in a multi-vehicle interstate accident can cause lower-back injuries." 524 Fed. Appx. at 871. That is precisely the case here with respect to Mr. Kilchenstein's symptoms immediately following the accident. But the medical record evidence—which reflects a three-month course of treatment, resolution of post-accident symptoms, and no further medical treatment—breaks the causal chain as to Mr. Kilchenstein's present-day symptoms.

Maryland courts have observed that "the causal relationship will almost always be deemed a complicated medical question and expert medical testimony will almost always be required when," among other things, there is "some significant passage of time between the initial injury and the onset of the trauma" or "the absence of any medical testimony." *S.B. Thomas, Inc.* v. *Thompson*, 114 Md. App. 357, 382 (1997). Here, more than two-and-a-half years have elapsed since Mr. Kilchenstein discontinued medical treatment for the injuries sustained—and resolved, per the contemporaneous medical records—and the symptoms of Mr. Kilchenstein's injuries are "subjective in nature." *Wilhelm*, 230 Md. at 100. Yet, at trial, Mr. Kilchenstein offered no medical testimony or evidence or expert testimony to explain how Mr. Kilchenstein's present-day symptoms arose from the April 27, 2023 accident. Mr. Kilchenstein is therefore not entitled to an award of noneconomic damages based on his current physical complaints. *Empire Realty Co. Inc.* v. *Fleisher*, 269 Md. 278, 284 (1973) ("It is the general rule

19

that one may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate[,] and direct effect of the injury.").

The same analysis holds true for the reported change in Mr. Kilchenstein's engagement in pastimes or leisure activities. First, it is unclear whether Mr. Kilchenstein is unable to engage in outdoor activities or attend his daughter's cheerleading competitions. The witness testimony consistently asserted that Mr. Kilchenstein does not participate in these activities with the same frequency as before. *See* II., *supra.* But it is unclear why, or even that, Mr. Kilchenstein is foreclosed from doing so. Indeed, the evidence of record establishes that Mr. Kilchenstein and Mr. Ballentine went hunting just a few weeks before trial in April 2026. Likewise, even if Mr. Kilchenstein is unable to travel long distances in a car, it is unclear why he did not use another means of transportation to attend his daughter's competitions, many of which were in distant states.[9] Even if Mr. Kilchenstein's physical limitations did affect his ability to engage in these and other pursuits, for the same reason discussed previously, it is unclear that the April 27, 2023 accident was the cause. The undersigned will not award noneconomic damages based on Mr. Kilchenstein's asserted loss of enjoyment.

Finally, with respect to Mr. Kilchenstein's retirement and nightmares, there is again an inadequate evidentiary record upon which to award noneconomic damages. Notably, Mr. Kilchenstein offered no testimony as to why he retired or how his retirement has affected him. The only evidence on this score is Mrs. Kilchenstein's testimony that he retired because he had to drive past the accident location, which is insufficient to carry Mr. Kilchenstein's burden of proof. Mrs. Kilchenstein testified that Mr. Kilchenstein has nightmares, but there is no evidence that the nightmares are related to the motor vehicle accident. Again, Mr. Kilchenstein offered no

---

[9] Mr. Kilchenstein's testimony on this point was inconsistent as well. He said both that if he goes on a long drive then his wife is driving, and that he does not feel comfortable riding in a vehicle for a long-distance drive.

testimony as to the content of the nightmares or their effect upon him.  The undersigned will therefore award noneconomic damages based only on the traumatic nature of the accident and the resulting injuries, which were minor in nature and resolved after three months of treatment.

Decisions of this Court have awarded noneconomic damages in the range of $7,500 to $45,000 in similar circumstances.  For example, in *Goodson* v. *United States*, the Court awarded $7,500 in noneconomic damages associated with the plaintiff's physical injuries, which resolved after approximately three months.[10]  Civil Action No. WGC-14-324, 2015 WL 5830894, at *4-5 (D. Md. Oct. 1, 2015).  In *Scott* v. *United States*, this Court awarded $16,000 in noneconomic damages based on the "the length of Ms. Scott's medical treatment, her physical pain, her physical limitations and the inconvenience to her lifestyle."  2009 WL 10685271, at *15.  Unlike Mr. Kilchenstein, Ms. Scott sustained a cervical injury that was "chronic" and "permanent" and required future medical care.  *Id.* at *13-15.  Nevertheless, the motor vehicle accident that precipitated the injuries in *Scott* involved a far less severe collision at a much lower speed.  *Id.* at *6.  In *Edwards* v. *Lasarko*, this Court awarded $30,000 in past non-economic damages and $5,000 in future economic damages.  Civil Action No. JMC-19-1897, 2021 WL 1515597, at *4 (D. Md. Apr. 16, 2021).  There, the plaintiff had sustained injuries to his shoulder, cervical spine, and thoracic spine as a result of a motor vehicle accident, which resulted in a total of $43,471.19 in medical expenses, nearly five times as much as those of Mr. Kilchenstein.  *Id.* at *2, 4.  The Court also credited the plaintiff's testimony that his rehabilitation following the occurrence and related medical treatment was "long and painful."  *Id.* at *2.  *Edwards* also involved a low-speed collision, where the plaintiff's vehicle was rear-ended while stopped at a traffic light.  *Id.* at *1.

---

[10]  The Court also awarded $24,000 in non-economic damages associated with the plaintiff's neurological injuries (migraines and post-traumatic stress disorder), which Mr. Kilchenstein does not allege or offer evidence in support of.  *Goodson* v. *United States*, Civil Action No. WGC-14-324, 2015 WL 5830894, at *5-6 (D. Md. Oct. 1, 2015).

Finally, in *Rozinsky* v. *Assurance Company of America*, the Court awarded $236,205 in noneconomic damages. Civil Action No. RDB-15-2408, 2017 WL 3383104, at *6 (D. Md. Aug. 7, 2017). The circumstances of the accident at issue there were the most similar to the case at bar, as Mr. Rozinsky's vehicle tipped onto its side as a result of the collision and emergency responders had to cut open the windshield to remove him from the vehicle. *Id*. at *3. Mr. Rozinsky's injuries, however, were more severe and enduring. He was transported to the hospital from the accident scene and experienced "swelling and tingling in his left hand, pain in his left arm and shoulders, and neck pain," that persisted despite "physical therapy, cortisone treatments, and several epidural shots." *Id.* Unlike the case at bar, it was undisputed that Mr. Rozinsky would "continue to experience some pain for the rest of his life." *Id.* Most importantly, nearly 80 percent of the Court's noneconomic damage award in *Rozinsky* was for future pain and suffering. *Id.* at *6 (awarding "$30.00 per day for every day since the accident through [Mr. Rozinksy's] remaining 17.5 years of expected life."). Thus, approximately $191,625 of the award was for future noneconomic damages, whereas only approximately $44,580 was for past noneconomic damages.

Considering the severity of the accident and Mr. Kilchenstein's injuries, as well as the duration and success of his medical treatment, the undersigned will award $27,500 in noneconomic damages.

## IV.    CONCLUSION

For the foregoing reasons, judgment is entered in favor of Mr. Kilchenstein and against the United States in the amount of $13,659.91 in economic damages and $27,500 in noneconomic damages, for a total award of $41,159.91. A separate Order follows.

Date:  May 27, 2026

_____/s/_____
Erin Aslan
United States Magistrate Judge